# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| MICHELLE L. ALMANZA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:15-cv-389 |
| | ) | (Jury demand) |
| LORETTA E. LYNCH, Attorney General, | ) | |
| United States Department of | ) | |
| Justice, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

### I. Nature of the Case

1.    The plaintiff, Michelle Almanza, brings this action against the Honorable Loretta E.

Lynch, as the United States Attorney General for the Department of Justice ["DOJ"],

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.,

["Title VII"] and under the Age Discrimination in Employment Act ["ADEA"], 29 U.S.C.

§ 626, et seq., for discrimination on the basis of her gender and age, and for retaliation for

protected activity under the laws.

### II. Jurisdiction and Venue

2.    Jurisdiction in this Court is founded upon 42 U.S.C. §2000e(5)(f)(1) and (3), and upon

the general jurisdiction of 28 U.S.C. §§1331 for federal questions arising under the

Constitution, laws, or treaties of the United States.

3.    The Eastern District of Tennessee at Knoxville is the proper venue for this action

pursuant to 28 U.S.C. §§1391 (b)(2), because this is the District and Division in which a substantial part of the events or omissions giving rise to the claims occurred.

### III.  Conditions Precedent

4.     Plaintiff Michelle Almanza has exhausted administrative remedies and satisfied all procedural and administrative requirements. In particular, Plaintiff:  a) timely contacted an Equal Opportunity Counselor to report her claims of discrimination, retaliation, and constructive discharge; b) timely filed her administrative complaint of discrimination on September 10, 2014; c) is timely filing this Complaint, pursuant to 29 C.F.R §1614.310, within thirty days (30) of receipt of the DOJ's final agency decision issued on July 31, 2015.  Thus, all conditions precedent to filing suit in this Court have been met.

### IV.  The Parties

5.     The plaintiff, MICHELLE ALMANZA, is a citizen of the United States, and currently resides in Madison, Wisconsin.  During the events giving rise to this lawsuit, Ms. Almanza resided in Knoxville, Tennessee, and was employed by the defendant DOJ in the United States Attorney's Office, Eastern District of Tennessee, as an Information Technology (IT) Specialist.

6.     The defendant, LORETTA LYNCH, is Attorney General of the United States Department of Justice ["DOJ"], and is sued in her official capacity as the current head of the DOJ, which is an executive department of the federal government.

2

## V.  Factual Allegations

7.    At all times relevant, the defendant DOJ was the plaintiff's employer as defined by Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.

8.    Michelle Almanza is female.  Her date of birth is July 6, 1972.

9.    Ms. Almanza has worked for the federal government in various positions for nearly twenty-five (25) years, beginning on December 3, 1990.

10.   In June 2008, she began working as an IT Specialist for the U.S. Attorney's Office, Eastern District of Tennessee ["EDTN"], and was based in the Knoxville office.  At the time she was constructively discharged in 2014, her position was designated as GS-12.

11.   Throughout her twenty-five year career, Ms. Almanza has always received excellent performance ratings.  Specifically, since 1990, she has never received a performance rating less than "fully successful." In fact, only about two ratings were "fully successful" while the rest were either "superior" or "outstanding."

12.   Ms. Almanza has received numerous awards, some from EDTN, including one from EDTN in early 2014.  EDTN also nominated Ms. Almanza for a DOJ Director's Award in approximately 2013 or 2014.

13.   Likewise, she was awarded two Quality Step Increases (QSIs), one of which was given by EDTN in 2010 based on "superb performance." A QSI is awarded sparingly and only to employees who go above and beyond their job duties.

14.   In January 2012, Mr. Chris English was assigned to supervise Ms. Almanza in the IT department.  He previously worked for the federal government in Alabama before he was hired as the Systems Manager at the U.S. Attorney's Office in Knoxville.

15.   Mr. English's job position was Systems Manager, while Ms. Almanza worked as the

3

Assistant Systems Manager.  Other than Mr. English's supervisory duties, their job duties were essentially the same.

16.    Mr. English's direct supervisor was Administrative Officer (AO) Jane Archer until she departed from EDTN in August 2014.  Thereafter, his direct supervisor became Nancy Harr, First Assistant United States Attorney (FAUSA).  Both women were involved in the decision to hire Mr. English for the Systems Manager position.

17.    After Mr. English arrived at the EDTN office in approximately January 2012, he hired a part-time male student employee to perform IT related duties and litigation support.  The student's job position is designated as GS-5.  He is substantially younger than Ms. Almanza.

18.    Mr. English also hired a male contract employee to perform IT related duties and litigation support in the Chattanooga branch.  He, too, is substantially younger than Ms. Almanza.  The contractor was recently hired by the EDTN office as a full-time government employee in the position of IT Specialist, designated as GS-5.

19.    Mr. English instructed Ms. Almanza to train the student employee in her IT job duties.

20.    Ms. Almanza began to notice that Mr. English seemed to treat her differently and worse than the newly-hired, younger male employees.

21.    Mr. English was often absent from the office and expected Ms. Almanza to perform many aspects of his job for him while he was out, which she did routinely without objection.

22.    In March 2013, Mr. English met with Ms. Almanza for a performance review, at which time a heated discussion ensued after Mr. English provided Ms. Almanza with what she believed was a discriminatory and unfair performance rating on the Systems Administration element of her review.

4

23. After this meeting, Ms. Almanza promptly sent an email message to Mr. English's supervisor, AO Jane Archer, officially requesting an intervention due to Mr. English's hostile and discriminatory treatment toward her.

24. Since then, and in retaliation for her protected activity, Mr. English subjected Ms. Almanza to a hostile work environment and continued to treat her differently and worse than the younger, male employees, and employees who have not engaged in protected activities.

25. Ms. Almanza made repeated efforts to resolve the disparate treatment and hostility to which Mr. English was subjecting her.

26. In May, 2014, after Ms. Almanza again reported hostility and disparate treatment by Mr. English, AO Jane Archer removed Mr. English from Ms. Almanza's chain of command.

27. However, on July 17, 2014, Mr. English issued Ms. Almanza an unwarranted, discriminatory, and retaliatory Letter of Reprimand for alleged inappropriate behavior that occurred weeks earlier when he was not assigned as her supervisor.

28. Based on this unwarranted disciplinary action and continuing hostility toward her, Ms. Almanza again sought to resolve the situation, this time by utilizing her employer's EEO administrative process. She contacted an EO Counselor and filed a Pre-Complaint of Discrimination on July 30, 2014.

29. Almost immediately thereafter, and in retaliation for her protected activity of filing an EEO Complaint against him, Mr. English engaged in numerous continuing acts of retaliation and discrimination in an effort to force Ms. Almanza to quit.

30. Due to Mr. English's heightened scrutiny and constant criticism of Ms. Almanza, she began to suspect that it was only a matter of time before he would conjure a way to

5

terminate her employment.

31.     Her belief was reinforced when AO Archer upheld the Letter of Reprimand, despite Ms. Almanza having reported her concerns about discrimination and retaliation to Ms. Archer since at least March 2013, when she requested an official intervention.

32.     Shortly after upholding the Letter of Reprimand, AO Archer departed from the EDTN office. FAUSA Nancy Harr replaced her as Mr. English's direct supervisor.

33.     In preparation for Ms. Archer's departure, Ms. Harr was included on some of the correspondence relating to the Letter of Reprimand and Ms. Almanza's EEO complaint against Mr. English.

34.     Not long after Ms. Harr became Mr. English's supervisor, she sent an email message to Ms. Almanza that was intended for Mr. English. The tone and substance of the message immediately confirmed to Ms. Almanza that Ms. Harr was not an objective party to whom Ms. Almanza could turn for assistance.

35.     As Mr. English continued to engage in disparate treatment and retaliation toward Ms. Almanza, apparently with impunity from management, she realized that if conditions did not improve she would need to secure alternative employment.

36.     Examples of the types of discriminatory and retaliatory harassment to which her supervisor subjected her include:

    a.     Abusive verbal comments;

    b.     Taking away flexible work schedule;

    c.     Forcing her to take leave when flexible work schedule would have accommodated her requested hours;

    d.     Bombarding her with assignments that could not possibly be accomplished within

6

the time allowed, or with little or no training provided;

e.      Assigning her to work extremely long hours despite knowledge that, as a single parent, she was unable to regularly or spontaneously work such hours;

f.      Excessively scrutinizing and criticizing her on nearly a daily basis;

g.      Giving her inconsistent and conflicting instructions regarding work assignments;

h.      Isolating her from user/clients;

i.      Holding her to higher standards and stricter rules than her peers;

j.      Undermining her work to make her look bad to user/clients;

k.      Disabling her access to the system she needed to perform her job and then not informing her of such;

l.      Taking away her IT-related job duties and giving them to the younger male employees while forcing her to take on projects and litigation support work;

37.      In addition, Mr. English has made age-based and gender-based comments. For example, he told Ms. Almanza that he was taking the male student instead of her to perform a task outside the office that required lifting equipment because he did not think she could do it, when, in fact, Ms. Almanza has performed the same work in the past with her previous Systems Manager who is a very petite woman. Mr. English also made comments about the younger employees' skills being superior to Ms. Almanza's skills due to relative ages, and that her skills were outdated, which was not true.

38.      Although the hostile environment existed since at least early 2013, it escalated as Ms. Almanza continued her efforts to report and respond to it. Likewise, the severity of Ms. Almanza's emotional distress caused by the hostile environment continued to escalate over time. She began to dread going to the job she once loved, and there were days when

7

she needed to take leave because she could not handle the distress caused by the continuous harassment.

39.    As explained in further detail below, due to the ongoing discriminatory and retaliatory actions with the support of EDTN management, Ms. Almanza realized that the unbearable conditions of her employment would not cease, and she eventually accepted a job position at the U.S. Attorney's Office in Madison, Wisconsin, as a result of the constructive discharge from the EDTN office.

40.    Specifically, in the six months before Ms. Almanza was constructively discharged, she was subjected to severe and pervasive harassment, including but not limited to the following:

41.    In early May, 2014, while Mr. English was out of the office for the week, he instructed Ms. Almanza to "catch up" on any tech bulletins that were lacking, even though he had only just certified several tech bulletins that were prerequisites for three of the ones he expected Ms. Almanza to perform while he was gone.  He created and knowingly tasked her with an unreasonable assignment that could not be completed while fulfilling other job duties.  Ms. Almanza believed that Mr. English was intentionally trying to set her up for failure, and she reported his discriminatory and retaliatory behavior to AO Archer after Archer returned to the office from extended leave.

42.    In mid-May, 2014, Ms. Almanza learned that Mr. English was instructing the student employee to perform aspects of her IT duties that Mr. English should have asked her to perform.

43.    On or about May 15, 2014, in response to Ms. Almanza's complaint that Mr. English was setting her up for failure, Ms. Archer called a meeting with Mr. English and Ms. Almanza

8

to inform them that she, Ms. Archer, would supervise Ms. Almanza for the next 120 days.

44. Ms. Archer also explained that Ms. Almanza would be removed from the Systems Managers distribution list and related groups. Ms. Almanza did not request nor want to be removed from the distribution and group lists as it undermined her ability to perform her job. She had been on these lists for years, as are most Assistant Systems Managers in other districts. She believes that Mr. English sought her removal from these groups in order to isolate her from the IT group and distance himself from her ability to view his work.

45. On or about May 19, 2014, after nearly six years of working in the Knoxville office and signing in and out for lunch at the front desk, Mr. English instructed Ms. Almanza to start sending an email when she was leaving for lunch and again when she returned from lunch. Ms. Almanza complained to AO Jane Archer that she believed this was retaliation for having reported her concerns about discrimination. Later, it was agreed that all IT staff would use the whiteboard in the IT conference room to display when they were leaving the building. Mr. English, however, did not enforce this rule with the student, who rarely signed out on the whiteboard when he left the building or when he left with Mr. English.

46. In late May, before Ms. Almanza went on vacation, she was instructed to provide her timesheets to Ms. Archer as her temporary supervisor. By the time she returned from vacation, supervisory duties were being shifted back to Mr. English, and she was instructed that he would be responsible for her timesheets.

47. On or about June 5, 2014, while Mr. English was out of the office, AO Archer called Ms. Almanza into her office to inform her that due to the conflicting instructions being given

by her and Mr. English to Ms. Almanza, Ms. Archer decided that Ms. Almanza would go back to the previous chain of command and report directly to Mr. English again. Ms. Archer then informed Ms. Almanza that she would be retiring in the near future.

48. Thus, despite Ms. Almanza's repeated complaints of disparate treatment and retaliation, nothing was done to remedy the situation.

49. In early June when Mr. English was out of the office, there was a power outage. He communicated only with the student about it instead of with Ms. Almanza, even though Ms. Almanza was responsible for such issues as the Assistant Systems Manager and was actively responding to the problem.

50. On or about June 10, 2014, Ms. Archer called Ms. Almanza into her office to discuss emails that Ms. Almanza sent to Mr. English. Ms. Archer accused Ms. Almanza of "challenging Chris" in her email messages. Ms. Almanza's messages had not challenged Mr. English, but merely sought clarification on certain issues and assignments.

51. The next day, because Ms. Almanza was still upset by the meeting with Ms. Archer, she sent a follow-up email to her and forwarded a copy to FAUSA Nancy Harr because Ms. Archer had announced her upcoming departure. Only after another email request from Ms. Almanza on June 26 did Ms. Archer and Ms. Harr agree to meet with her on July 2 to discuss her concerns.

52. Mr. English continued to isolate Ms. Almanza and shift her duties to the student employee. He notified the student, and not Ms. Almanza, of his whereabouts and absences from the office. When the U.S. Attorney, Bill Killian, needed assistance with his iPhone, Mr. English contacted the student to assist him, instead of the Assistant Systems Manager.

10

53.     In an email to Mr. English on or about June 20, Ms. Almanza asked if she was being replaced as the Assistant Systems Manager. When Mr. English did not address her question, she asked again, but he never responded to her question.

54.     On or about June 24, 2014, Mr. English cancelled the IT staff meeting but still met with the student alone in his office for 30-40 minutes to discuss IT issues.

55.     On or about June 27, 2014, Ms. Almanza sent an email to Cheryl Lykens, the HR Officer, to let her know that she was sick and wouldn't make it to the office that day. She copied Mr. English and Ms. Archer who were both out of the office that day. Mr. English sent a response stating, "As the case has been for 2 ½ years, you need to call both of my phones (office cell and personal cell) in this situation. Chris." In reality, until this point, an email message had always sufficed.

56.     Mr. English's unwritten policy regarding taking sick leave apparently only applied to Ms. Almanza because when the student called in sick on July 1-3, he told Ms. Almanza, upon her inquiry, that he notified Mr. English either by text or email message.

57.     On or about June 30, 2014, Ms. Archer asked Ms. Almanza to coordinate the installation of a new UPS for the 1st floor closet. Ms. Almanza was unaware that a decision had been made to get one; however, the student was aware of this decision. Mr. English again left Ms. Almanza out of the loop on important issues that he should have communicated to the Assistant Systems Manager.

58.     On or about July 2, 2014, Ms. Almanza attended the meeting with Jane Archer and Nancy Harr. They suggested that Ms. Almanza could work from another branch to avoid Mr. English. This was not helpful because Mr. English would still supervise Ms. Almanza, and it failed to address his discriminatory and retaliatory actions toward her.

Furthermore, being required to commute great distances to try to avoid Mr. English's hostility toward her felt like punishment for reporting his discriminatory and retaliatory behavior.

59. At this meeting, Ms. Archer and Ms. Harr asked Ms. Almanza if she would be interested in performing the Litigation Support job, to which she unequivocally answered no. Ms. Almanza was willing to assist when necessary, but for numerous reasons, including inability to work the required hours as a single parent, she made clear her opposition to being assigned primary responsibility for the Litigation Support job.

60. The very next day, July 3, Ms. Almanza received an email message from Mr. English stating that she was to mirror the student on litigation support tasks and that the student was to mirror her on SharePoint tasks. He also instructed her that she would no longer perform IT-related tasks such as Help Desk, and that her job duties were now limited to four areas: HotDocs; Litigation Support with the student; Case Management; and SharePoint with the student.

61. Thus, Mr. English was allowed to continue his discriminatory and retaliatory actions against Ms. Almanza through his assignment of tasks to her. She was the only female on staff in the IT department, and she was the only IT staff limited to projects and not allowed to perform IT-related work.

62. Mr. English assigned the majority of the IT-related tasks that Ms. Almanza previously performed as Assistant Systems Manager to the student and male contractor, in spite of, or because of, the fact that Ms. Almanza had expressed that she was not interested in taking on the Litigation Support job.

63. Ms. Almanza is a GS-12 IT Specialist, who was hired to perform IT work. The student is

a GS-5, and was supposed to handle litigation support, not take over accountability for Ms. Almanza's GS-12 work.

64.     After Mr. English instructed her not to respond to the HelpDesk, which had been one of her primary duties, she asked that an email message be sent to the staff notifying them of this change so that users would understand why she was not responding to them as usual. Ms. Archer denied her request, saying it was not necessary.

65.     Ms. Almanza forwarded the July 3 email from Mr. English to Ms. Archer and Ms. Harr, requesting clarification because they had previously indicated to her that she would not be assigned to do litigation support unless she was interested in the job, and she had specifically told them she was not.

66.     On or about July 5, 2014, Mr. English sent an email message confirming his decision to assign Ms. Almanza to train the student to take over her IT work, while assigning the student to train Ms. Almanza on his ligation support work.

67.     On or about July 7, 2014, Ms. Almanza sent a follow-up message to Ms. Archer asking if a decision had been made regarding her job position about which she was unaware.  Ms. Almanza's email and questions were never acknowledged.

68.     On or about July 9, 2014, in response to her "Daily email," which reports to Mr. English work she has performed that day, he reminded her to include the student in her SharePoint work, even though she did not perform any SharePoint work that day.  It became routine for Mr. English to excessively scrutinize Ms. Almanza's daily emails and constantly respond to, question, and criticize the details of her daily performance.

69.     On or about July 16, 2014, in her "Daily email," Ms. Almanza explained to Mr. English that his assigned Litigation Support training schedule was much too aggressive.  She was

being required to learn multiple new programs and projects without adequate time. Because his expectations were so unreasonable, she believed that Mr. English was again trying to set her up to fail or overwhelm her, and it was working.

70. On or about July 17, 2014, Mr. English issued Ms. Almanza a Letter of Reprimand for what she firmly believes to be reprisal for opposing and reporting his discriminatory treatment of her. The reprimand letter references inaccurate or incomplete information, such as portions of email messages between them that are taken out of context.

71. At the time the referenced emails were written in mid-May, Ms. Archer had instructed Ms. Almanza that Mr. English would not be acting as her supervisor for the next 120 days due to Ms. Almanza's complaints.

72. Despite Ms. Almanza voicing concerns about the unreasonable amount of work and training he was assigning to her, Mr. English instructed Ms. Almanza to sign up for yet another online court presentations training course. He continued to try to overwhelm her with litigation support assignments while transferring her IT duties to the student.

73. Within a week of contacting the EEO counselor by telephone to initiate the process to file an EEO complaint, on or about August 11, management was made aware of the filing.

74. On or about August 14, 2014, while Ms. Almanza was performing district assistance in Wisconsin, Ms. Archer denied Ms. Almanza's grievance related to the Letter of Reprimand.

75. On or about August 25, 2014, after Ms. Almanza responded to a HelpDesk email because she was the only IT person available to respond at the time, Mr. English sent her a message reminding her to focus on her assigned projects. Ms. Almanza again asked that a message be sent to the staff notifying them that she would not be responding to

14

HelpDesk messages so that staff would not think she was just ignoring their requests for assistance. Mr. English denied this request, saying he would not send out an explanation of his work assignments.

76. Ms. Almanza forwarded this email to Nancy Harr asking why she was being removed from IT duties. FAUSO Harr responded that Mr. English is the Systems Manager and can assign work however he wants.

77. On or about August 26, 2014, Mr. English sent an email message to Ms. Almanza criticizing her for not following his instructions when she assisted a supervisory AUSA (a member of management). The AUSA had sought help when he was locked out of his computer, and Ms. Almanza was the only IT person available to help at the time.

78. Ms. Almanza sent a follow-up email to Nancy Harr seeking clarification about the restrictions on her ability to assist members of management who seek IT help from her. Ms. Harr did not answer her question but responded that she was supporting Mr. English.

79. On or around this time, Mr. English denied Ms. Almanza's request to telework, even though her requests in the past had never been denied.

80. Mr. English instructed Ms. Almanza that she was not allowed to take a lunch break unless she works a full 8-hour workday; however, Mr. English does not apply that rule consistently to the younger male employees.

81. Ms. Almanza had been working a flexible "any 80" work schedule since April 2013. Even though she had actually worked in excess of 80 hours during a pay period, Mr. English began to require her to use leave.

82. Ms. Almanza received an email from Mr. English on or about August 28, 2014, titled "Hours and Leave." In it, he gives her contradictory instructions that she can no longer

15

work a flexible schedule, even though she must work a flexible schedule to accommodate the litigation support duties to which she was now responsible.

83. Mr. English offered no explanation for his decision to take away from Ms. Almanza the benefit of a flexible schedule.

84. Thereafter, Ms. Almanza was forced to use leave when the "any 80" schedule would have accommodated situations such as doctor's appointments. Mr. English denied two leave slips (August 26 and 28) because he insisted that she must use leave rather than make up the time by working additional hours.

85. Most employees, including the student and contractor, are allowed to offset hours even though they are not on an "any 80" schedule. For example, around the same time that Mr. English had refused to honor Ms. Almanza's flexible schedule, on or around August 28, 2014, he allowed the student, who is NOT on a flexible schedule, to arrive to the office 30 minutes late and then stay late to make up the time.

86. On or about August 29, 2014, the day after he revoked Ms. Almanza's flexible work schedule, Mr. English instructed her to fill out comp time forms to accommodate working late hours performing litigation support work for an upcoming trial. The forms showed that she would work until 8:00 p.m., Monday thru Friday, and all day Saturday and Sunday. She was expected to keep this schedule for four to five weeks. Ms. Almanza responded that she was unable to accommodate those hours because of her responsibilities to her children, of which Mr. English was already aware.

87. On or about August 29, 2014, Ms. Almanza sent a message to Mr. English informing him that the U.S. Attorney, Bill Killian, had contacted her directly for assistance three times in the past two days, and she requested clarification as to whether she should refer the U.S.

Attorney to either him or the student based on his instructions to her that she was not to respond to HelpDesk traffic.

88. FAUSA Nancy Harr replied to Ms. Almanza, but her message was clearly intended for Mr. English. Ms. Harr stated, "she is deliberately trying to engage you in dialogs, to show you are inconsistent. Short direct responses are best."

89. When Ms. Harr realized she sent her message to Ms. Almanza instead of Mr. English, she sent another message to Ms. Almanza confirming her belief, but answering Ms. Almanza's legitimate question, explaining that "You should respond to direct requests from senior management, and you should not engage in debates over directions."

90. Ms. Harr's instruction contradicted Mr. English's instruction, yet she warned Ms. Almanza not to engage in debates over directions. Despite Ms. Almanza's legitimate question and concern, her simple request for clarification was perceived as an attempt to trick Mr. English and as improperly challenging his authority. No matter what Ms. Almanza said or did, she was in a Catch 22 and could not win.

91. Mr. English continued to excessively scrutinize Ms. Almanza's work and inundate her with requests for status updates and requests for more detailed updates, even though she had continued to submit her daily updates as usual.

92. On or about September 11, 2014, despite being granted permission to attend the last three Systems Managers National Conferences, Ms. Almanza's request to attend the Conference was denied. The reason given was that Mr. English would be attending. In the past, she was allowed to attend along with the previous Systems Manager.

93. On or about September 12, 2014, an Assistant U.S. Attorney walked into Ms. Almanza's office seeking her help with a computer in one of the conference rooms. She had agents

17

in the room waiting. Out of fear that she would be accused of insubordination for helping, Ms. Almanza called Mr. English to ask if she could perform her job by assisting this AUSA. He refused to allow her to assist.

94. Ms. Almanza sent a follow-up message regarding the annual IT Conference, and again requested clarification on when she should assist users. She received no reply.

95. On or about September 16, 2014, Ms. Almanza's administrative account was disabled. According to FAUSA Nancy Harr, her account was disabled specifically until senior management could decide a course of action responsive to her EEO complaint against Mr. English. Thus, the decision to disable her administrative access, which undermined her ability to perform her job, was in direct retaliation to Ms. Almanza's protected activity.

96. On or about September 18, 2014, Ms. Almanza learned that she had been removed from the USATNE-HelpDesk distribution list, although no one had notified her of that fact. The result of this action was to completely undermine Ms. Almanza's ability to perform her Assistant Systems Manager IT duties, and would insure her ignorance of IT-related issues impacting the Eastern District of Tennessee.

97. On or about September 23, 2014, another of Ms. Almanza's requests to telework was denied with no legitimate explanation offered, even though her telework requests had always been granted until she filed an EEO complaint.

98. On or about September 24, 2014, upon returning to her office following office renovations and attempting to set up her phone and computer, Ms. Almanza realized that she no longer had network access. She sent a message to Mr. English asking if he wanted her to troubleshoot the problem. Mr. English and Ms. Harr came to her office shortly

18

thereafter. Ms. Harr explained that due to the circumstances, she would be involved with any interaction between Mr. English and Ms. Almanza.

99. Ms. Harr then informed Ms. Almanza that because her office was one of the nicer work spaces, the new Administrative Officer may choose to use it. Ms. Almanza understood that she should not unpack her boxes. Shortly after her constructive discharge, her office was given to the student who had taken over her IT duties.

100. On or about October 8, 2014, Ms. Almanza went to Ms. Harr's office to tell her that the Wisconsin U.S. Attorney's office would be calling her for a job reference. She explained that she had applied for the Systems Manager position located in the Wisconsin Western District and had already interviewed with the district and EOUSA. Ms. Harr closed the door to her office and asked, "Are you recording this conversation?" Ms. Almanza Responded, "No." Ms. Harr then stated that their conversation was "off the record" and that she would deny it if Ms. Almanza repeated it to anyone. Ms. Harr proceeded to say that Ms. Almanza moving onto another job "would be the best option for everybody." She referenced Ms. Almanza's prior complaints to her about Mr. English's treatment of her, and told Ms. Almanza that "it's not going to get any better for you in this district." She told Ms. Almanza that a settlement offer was going to be offered to her that would reassign Ms. Almanza to Ms. Harr's supervision, but that Ms. Almanza would not be happy with her work assignments. Ms. Harr told Ms. Almanza that "you will be as miserable as you are right now - and I don't know why you would want to continue like that."

101. Ms. Harr made it clear to Ms. Almanza that she no longer wanted Ms. Almanza in the district. Ms. Almanza was so shocked by her comments that she burst into tears and

sobbed in Ms. Harr's office.

102. Ms. Harr's statement was consistent with Ms. Almanza's recent experience that removing Mr. English from her chain of command lasted only briefly, was unsuccessful, and the hostile environment was allowed to continue even when Mr. English was not her supervisor.

103. It was at or shortly after this meeting with Ms. Harr on October 8, 2014, that Ms. Almanza realized that she would need to resign and leave the East Tennessee District in order to escape the hostile work environment. She understood from that meeting that Ms. Harr and Mr. English were going to continue giving her IT duties to the student and force her into the Litigation Support position that she had already told them she was not interested in performing. The settlement offer confirmed Ms. Harr's statement and Ms. Almanza's understanding that they intended to force her into the Litigation Support job.

104. Based on the totality of the circumstances leading up to this meeting, Ms. Almanza believed that her work environment was intolerable. After the meeting, she lost any optimism that it would change for the better, and she realized that her resignation was the reasonable and necessary response.

105. Until she experienced the discrimination and retaliation in the Knoxville office, she had not considered the idea of leaving her home and community. Ms. Almanza has children in school and in college in Knoxville. As a single parent, she relies on her family, including her older children, siblings, and aging parents who live in the area. The idea of taking such a drastic step to move so far away from Knoxville to escape the harassment caused Ms. Almanza to suffer severe emotional distress.

106. Ms. Almanza became so distraught about leaving her family and community that it was

necessary for her to take medical leave from work to try to cope with the distress.

107. Ms. Almanza informed Ms. Harr of her decision to accept the job in Wisconsin on or about October 21, 2014. She began her new job on November 30, 2014.

108. Her decision to resign, although necessary, was traumatic for Ms. Almanza. She continued to experience severe emotional distress due to the harassment, constructive discharge, and being forced to leave her family, friends, community, support system, and a job she had loved until the unremedied discrimination and retaliation made it intolerable.

109. Ms. Almanza had to leave her young daughter and son in Knoxville with other family members while she initially relocated to Wisconsin. She drove back and forth between Knoxville and Wisconsin to be with her children as often as possible while they finished their school year and while she found a place for them to live together as a family.

110. Ms. Almanza reasonably believed that her only recourse to escape from the discrimination and retaliation was to quit her job in the EDTN and accept the job in the U.S. Attorney's Office in Wisconsin.

111. A reasonable person in Ms. Almanza's shoes would have felt compelled to resign based on the intolerable conditions to which she was subjected and its toll on her health from the resulting emotional distress that had been constant and increasingly severe for more than a year.

112. As a result of the discrimination, retaliation, and constructive discharge, Ms. Almanza has incurred significant financial losses, including but not limited to, losses related to managing two places to live, relocating her belongings and family to Wisconsin, purchasing a home, paying for childcare (which was not necessary when she lived near

extended family), and paying steep property and state income taxes that she would not have incurred in Tennessee.

## VI. Causes of Action

### Violation of Title VII of the Civil Rights Act

113. Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

114. The acts of the defendant constitute unlawful gender discrimination and retaliation against the plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

115. The defendant subjected the plaintiff to hostile work environment because of her gender and in retaliation for her protected activity reporting discrimination and retaliation.

116. The defendant's actions toward the plaintiff would dissuade a reasonable worker from making or supporting a charge of discrimination.

117. The defendant's discriminatory and retaliatory actions constructively discharged the plaintiff from her job.

### Violation of the Age Discrimination in Employment Act

118. Plaintiff repeats and re-alleges each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

119. The acts of the defendant constitute unlawful age discrimination and retaliation against the plaintiff in violation of the Age Discrimination in Employment Act ["ADEA"], 29 U.S.C. § 626, et seq., and specifically § 633a, as applicable to federal employees.

120.    The defendant subjected the plaintiff to a hostile work environment because of her age and in retaliation for her protected activity reporting discrimination and retaliation.

121.    The defendant's actions toward the plaintiff would dissuade a reasonable worker from making or supporting a charge of discrimination.

122.    The defendant's discriminatory and retaliatory actions constructively discharged the plaintiff from her job.

123.    The defendant knowingly and wilfully discriminated against the plaintiff because of her age in violation of the ADEA.

## VII.  Relief Sought

124.    The plaintiff requests that this Court grant the following relief:

a.    Enter judgment for the plaintiff against the defendant, declare that the acts of the defendant violate Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ["ADEA"], 29 U.S.C. § 626, et seq., and enjoin the defendant from further discriminatory and retaliatory practices;

b.    Award the plaintiff all lost income, back pay, benefits, including for leave taken as a result of the defendant's actions, and financial adjustments to which she is entitled;

c.    Award the plaintiff liquidated damages;

d.    Reinstate the plaintiff to her former position in the United States Attorney's Office, Eastern District of Tennessee; or in the alternative, award the plaintiff front pay for all future lost income and benefits to which she is entitled;

e.    Award the plaintiff compensatory damages for emotional distress in an amount to be determined by a jury.

f.      Award the plaintiff reasonable attorney's fees and the costs of this cause.

g.      Award the plaintiff additional compensation for relocation expenses, differential for higher cost of living and taxes, any adverse tax consequence of lump sum payment, interest, and such further relief as this Court deems just, proper, and equitable.

h.      The plaintiff requests a jury trial in this cause.


Respectfully submitted,


MICHELLE ALMANZA




BY:     /s Jennifer B. Morton
        Jennifer B. Morton, BPR #015585
        Maha M. Ayesh BPR #025244
        Attorneys for Plaintiff

        **Jennifer Morton Law, PLLC**
        8217 Pickens Gap Road
        Knoxville, TN  37920
        (865) 579-0708
        (865) 579-0787 facsimile
        jen@jmortonlaw.com
        maha@jmortonlaw.com

24